**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) SCOTT W. BIRDWELL, an individual.  ) | |
| ) | |
| Plaintiff,                                      ) | |
| ) | |
| v.                                                    ) | Case No.: 15-CV-00304-TCK-TLW |
| ) | |
| (1) STANLEY GLANZ, SHERIFF OF     ) | |
| TULSA COUNTY, in his personal         ) | |
| capacity and official capacity, and      ) | |
| (2) BOARD OF COUNTY                      ) | |
| COMMISSIONERS OF TULSA COUNTY,) | ATTORNEY LIEN CLAIMED |
| (3) UNKNOWN NURSE #1, and             ) | JURY TRIAL DEMANDED |
| (4) UNKNOWN ATTENDING                 ) | |
| PHYSICIAN #1,                                  ) | |
| ) | |
| Defendants.                               ) | |

**COMPLAINT**

COMES NOW, Plaintiff, Scott W. Birdwell, by and through his attorney of

record, Donald E. Smolen, II, of SMOLEN, SMOLEN & ROYTMAN, PLLC, and for his cause

of action against Defendants, Sherriff Stanley Glanz, Sheriff of Tulsa County, in his

personal and official capacity, the Board of County Commissioners of Tulsa County,

Unknown Nurse #1, and Unknown Attending Physician #1, alleges and states the

following:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff is a citizen of Oklahoma.

2. Defendant Stanley Glanz ("Sheriff Glanz" or "Defendant Glanz") is, and was

   at all times relevant hereto, the Sheriff of Tulsa County, Oklahoma, residing

   in Tulsa County, Oklahoma and acting under color of state law.  Defendant

   Glanz, as Sheriff and the head of the Tulsa County Sheriff's Office ("TCSO"),

was, at all times relevant hereto, responsible for ensuring the safety and well-being of inmates detained and housed at the Tulsa County Jail, including the provision of appropriate medical and mental health care and treatment to inmates in need of such care, pursuant to 57 Okla. Stat. § 47. In addition, Defendant Glanz is, and was at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of TCSO and Tulsa County Jail, including the policies, practices, procedures, and/or customs that violated Plaintiff's rights as set forth in this Complaint. Defendant Glanz is sued in his individual and official capacities.

3. Defendant Board of County Commissioners of Tulsa County ("BOCC") is a statutorily-created governmental entity. 57 Okla. Stat. § 41 provides that "[e]very county, by authority of the *board of county commissioners* and at the expense of the county, *shall have a jail* or access to a jail in another county *for the safekeeping of prisoners lawfully committed.*" (emphasis added). BOCC must discharge its responsibilities to the Tulsa County Jail in a constitutional manner.

4. Defendant Armor Correctional Health Services, Inc. ("ARMOR") is a foreign corporation doing business in Tulsa County, Oklahoma and was at all times relevant hereto responsible, in part, for providing medical services and medication to Plaintiff while he was in the custody of TCSO. ARMOR was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health

care to inmates at the Tulsa County Jail, and for training and supervising its employees. ARMOR was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that ARMOR became an agency or instrumentality of the State and subject to its constitutional limitations.

5.  Defendant Unknown Nurse # 1, whose identity is presently unknown, was, at all times relevant hereto, an employee and/or agent of ARMOR, who was, in part, responsible for overseeing Plaintiff's health and well-being, and assuring that Plaintiff's medical and mental health needs were met, during the time he was in the custody of TCSO. Defendant Unknown Nurse # 1, was, at all times, acting under color of state law and within the scope of her employment. Defendant Unknown Nurse # 1 is being sued in her individual capacity.

6.  Defendant Unknown Attending Physician #1, whose identity is presently unknown, was at all times relevant hereto, an employee and/or agent of ARMOR, who was, in part, responsible for overseeing and treating Plaintiff's health and well-being, and assuring that Plaintiff's medical needs were met, during the time he was in the custody of TCSO. Defendant Unknown Attending Physician #1 is being sued in his individual capacity.

7.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

3

8.  The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

10. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## STATEMENT OF FACTS

11. Paragraphs 1-10 are incorporated herein by reference.

12. On or about June 7, 2014, Plaintiff was a trustee at the David L. Moss Criminal Justice Center (hereinafter referred to as "Jail" or "Tulsa County Jail"), and was cleaning laundry when he was assaulted by another inmate.

13. Plaintiff was struck by the inmate above his left eye by an unknown object, resulting Plaintiff suffering a serious laceration on the skin above his left eyebrow. However, this was not the fullest extent of his injuries, and Plaintiff conveyed to ARMOR medical staff at the Jail that he needed further treatment at the hospital.

14. Despite the Plaintiff's multiple complaints of pain and his requests to be sent to the hospital, responsible medical staff at the Jail disregarded Plaintiff's request to be examined thoroughly.  Plaintiff's eye was not examined and no

x-ray, MRI or other diagnostic procedures were performed, despite the obvious severity of Plaintiff's injuries.

15. The Jail medical staff, namely Defendant Unknown Attending Physician #1, installed 23 stitches in an attempt to close the laceration.

16. The procedure lasted approximately ninety (90) minutes. Plaintiff was told by Defendant Unknown Attending Physician #1 that "[a]n experienced E.R. doctor would have had these stitches in about twenty (20) minutes." Defendant Unknown Attending Physician #1 even joked that he should have studied plastic surgery more.  To Plaintiff, however, this was no laughing matter.

17. Suturing Plaintiff's wounds took as long as it did because the local anesthesia used was not manufactured for prolonged medical procedures. Again, no x-ray, MRI or other diagnostic procedures were performed, despite the obvious severity of Plaintiff's injuries.

18. After the suture procedure, Plaintiff was taken back to his cell.  ARMOR medical staff instructed Plaintiff to return to the medical unit in five (5) days to have the stitches removed in order to reduce Plaintiff's chance of severe scarring of his laceration.

19. Despite Plaintiff's repeated pleas to be seen by medical staff five (5) days after receiving the stitches, *ten days (10) passed* before Jail medical staff made an attempt to remove his stitches.

20. Upon his return to the Jail's medical unit, Plaintiff again brought up the severity of his injuries to Unknown Attending Physician #1, and he

communicated to the physician that his injuries had worsened with time. Specifically, along with pain at the laceration site, Plaintiff presented with added complaints of head pain, loss of vision, and blurred vision. These symptoms are directly related to the injuries he sustained from the assault on June 7, 2014.

21. Despite Plaintiff's requests for medical treatment for his rapidly worsening injuries, his request was denied and Defendant Unknown Nurse #1 began to prepare to remove Plaintiff's stitches. Defendant Attending Physician #1 failed to observe the procedure despite Defendant Unknown Nurse #1's lack of experience with removing stitches.

22. Indeed, Defendant Unknown Nurse #1 communicated to Plaintiff that she'd never removed stitches before.

23. With no oversight from a supervisor or attending physician, Defendant Unknown Nurse #1 ripped the sutures back open, resulting in the laceration splitting open. The five (5) day delay of treatment past the recommended point for the removal of stitches played a substantial role in the sutures splitting open, as Plaintiff's skin grew over his sutures.

24. Upon information and belief, and contrary to the policies and procedures of the Tulsa County Jail, Unknown Attending Physician #1 forgot to have Plaintiff sign a medical consent form prior to Plaintiff's treatment, and expressed his hope that he wouldn't be terminated as a result. Unknown Attending Physician #1 also commented that he wished that he had more experience as an Emergency Room doctor.

25. Plaintiff filed a grievance on June 23, 2014, complaining of severe migraines, physical damage to his eye, a loss of partial vision, shooting pains into his ear and throat, swelling on the left side of his head near the location of the laceration, and a possible brain hemorrhage.

26. On June 24, Nurse Gail Osborn, an employee or agent of ARMOR, told the physician on call that, given the severity of Plaintiff's injuries, he should have been sent to the hospital immediately after he was assaulted by the inmate.

27. Plaintiff sustained personal injuries as a result of Defendant's conduct.

28. Prior to filing this Complaint, Plaintiff sent notice to Tulsa County pursuant to the Oklahoma Governmental Tort Claims Act, 51 O.S. § 156, on the 15th of September, 2014. Ninety (90) days have passed since that time and Defendant has not approved Plaintiff's claim in its entirety, with the constructive denial date falling on the 31st of November, 2014. Plaintiff has filed a timely claim against the Defendant within 180 days of the constructive denial date of the 29th of May, 2015. Therefore, this action is timely brought pursuant to 51 O.S. § 157.

29. The deliberate indifference to Plaintiff's serious medical needs, as summarized *supra*, was in furtherance of and consistent with policies, customs and/or practices which Sheriff Glanz promulgated, created, implemented or possessed responsibility for the continued operation of.

30. There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. Sheriff Glanz has long known of these systemic deficiencies and the substantial risks to inmates

like Plaintiff, but has failed to take reasonable steps to alleviate those deficiencies and risks.

31. For instance, in 2007, the National Commission on Correctional Health Care ("NCCHC"), a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies and failure to address health needs in a timely manner. NCCHC made these findings of deficient care despite Sheriff Glanz's/TCSO's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

32. Sheriff Glanz failed to change or improve any health care policies or practices in response to the NCCHC's findings.

33. NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

34. NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 Report, NCCHC found, *inter alia*, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year…. The clinical mortality reviews were poorly performed"; "The responsible

physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "…diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented…"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "… potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks.  Training for custody staff has been limited.  Follow up with the suicidal inmate has been poor." 2010 NCCHC Report (emphasis added).

35. Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report.  Sheriff Glanz is unaware of any policies or practices changing at the Jail in response to 2010 NCCHC Report.

36. Over a period of many years, Tammy Harrington, R.N., former Director of Nursing ("DON") at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates.   The deficiencies observed and documented by Director Harrington include: chronic failure to triage inmates' requests for medical and mental health assistance; doctors refusing/failing to see inmates with life-threatening conditions; a chronic lack of supervision of clinical staff; and repeated failures

of medical staff to alleviate known and significant deficiencies in the health services program at the Jail.

37. On or about June 28, 2011, Ms. Lisa Salgado, died at the Jail due to grossly deficient medical care.

38. On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system – pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees -- as follows: ***"CRCL found a <u>prevailing</u> <u>attitude</u> among clinic staff of <u>indifference</u>…."***; "*Nurses are undertrained*. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to *lack of training and supervision*"; "Found two … detainees with clear mental/medical problems that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years". "ICE-CRCL Report, 9/29/11 (emphasis added).

39. Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

40. On the contrary, less than 30 days after the ICE-CRCL Report was issued, on October 27, 2011, another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency.

41. In the wake of the Williams death, which was fully investigated by TCSO, Sheriff Glanz made no meaningful improvements to the medical system.  This is evidenced by the fact that yet another inmate, Gregory Brown, died due to grossly deficient care just months after Mr. Williams.

42. On November 18, 2011, AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality" and issues with ***"nurses acting beyond their scope of practice [which] increases the potential for preventable bad medical outcomes."*** AMS-Roemer Report, 11/8/11 (Ex. 25) at CHM0171-72.  AMS-Roemer specifically commented on no less than six (6) inmate deaths (including the death of Mr. Jernegan), finding deficiencies in the care provided to each.  *Id.* at CHM0168-69; 0171.

43. It is clear that Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail.  For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."  Corrective Action Review at CHM1935 – 1938.

44. There is a longstanding policy, practice or custom at the Jail of TCSO refusing to send inmates with emergent needs to the hospital for purely financial purposes. This practice has been continued under ARMOR as part of the structure of its business model. That is, under ARMOR's contract with BOCC/TCSO, there are financial disincentives to send patients in need of urgent or even emergent medical attention to outside facilities.

45. In November 2013, BOCC/TCSO/Sheriff Glanz retained ARMOR as the new private medical provider. However, this step has not alleviated the constitutional deficiencies with the medical system. Medical staff is still undertrained and inadequately supervised and inmates are still being denied timely and sufficient medical attention. Bad medical outcomes have persisted due to inadequate supervision and training of medical staff, and due to the contractual relationship between BOCC/TCSO/Sheriff Glanz and ARMOR (which provides financial disincentives the transfer of inmates in need of care from an outside facility). Sheriff Glanz and ARMOR have known of the deficiencies, and the substantial risks posed to inmates like Plaintiff, but have failed to take reasonable steps to alleviate the risks.

46. As alleged herein, there are deep-seated and well-known policies, practices and/or customs of systemic, dangerous and unconstitutional failures to provide adequate medical and mental health care to inmates at the Tulsa County Jail. This system of deficient care -- which evinces fundamental failures to train and supervise medical and detention personnel -- created substantial, known and obvious risks to the health and safety of inmates like Plaintiffs. Still,

Sheriff Glanz and ARMOR have failed to take reasonable steps to alleviate the substantial risks to inmate health and safety, in deliberate indifference to Plaintiff's serious medical needs.

## CAUSES OF ACTION

### I.    NEGLIGENCE

47. Paragraphs 1-44 are incorporated herein by reference.

48. Defendants BOCC and ARMOR are vicariously liable for the acts of its employees and/or agents under the doctrine of *respondeat superior*.

49. Defendants BOCC and ARMOR, through their employees and/or agents at the Tulsa County Jail, owe a duty to Plaintiff, and all other inmates incarcerated at the Tulsa County Jail, to tender medical treatment with reasonable care, taking caution not to cause additional harm during the course of medical treatment.

50. As described herein, BOCC and ARMOR, through their employees and/or agents, particularly Defendant Unknown Attending Physician #1 and Defendant Unknown Nurse #1, breached their duty to Plaintiff, and all other inmates, by failing to provide competent medical treatment as required by applicable standards of care, custom and law.

51. Defendant Unknown Attending Physician #1 and Defendant Unknown Nurse #1, both agents and/or employees of BOCC and ARMOR, failed to provide adequate or timely evaluation and treatment, even as Plaintiff's known medical condition deteriorated and he had specifically requested medical attention while in TCSO's custody. Defendant Unknown Attending Physician #1 and Defendant Unknown Nurse #1, both agents and/or employees of

13

BOCC and ARMOR, failed to reasonably or timely treat Plaintiff's serious

medical condition, and prevented his timely transfer to a medical facility for

proper care.

52. Defendants' negligence is the direct and proximate cause of Plaintiff's

injuries.

53. As a result of Defendant's negligence, Plaintiff has suffered damages.

## II.    CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND/OR FOURTEENTH AMENDMENT  TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)

54. Paragraphs 1-51 are incorporated herein by reference.

55. Defendants knew there was a strong likelihood that Plaintiff was in danger of

serious personal harm due to the head injuries he suffered after being

assaulted by an inmate. Plaintiff had obvious, serious and emergent medical

issues that were known or obvious to Defendants following the assault. The

inmate hit Plaintiff with an unidentified object, using enough force to cause a

serious laceration above Plaintiff's left eye. This assault required twenty-three

(23) stitches to the region above Plaintiff's left eye. Furthermore, Plaintiff

complained of pain and a significant loss of vision in his left eye over the

course of waiting for further treatment.

56. Plaintiff voiced his concerns repeatedly over the course of his treatment. After

receiving stitches for the laceration over his left eye, Plaintiff was denied

further examination despite his multiple pleas to the medical staff to have his

head and eye examined at the hospital. Any person of reasonable prudence

would determine that Plaintiff was at a serious risk for a head injury that

would require further medical diagnosis and treatment.

57. Further, Plaintiff's injuries deteriorated rather than improved under the care of Defendants Unknown Nurse #1 and Attending Physician #1.  In fact, along with the mistakes that both Defendant's made during the course of Plaintiff's treatment, the medical staff made comments to Plaintiff during his treatment that caused Plaintiff to doubt Defendant Unknown Nurse #1 and Unknown Attending Physician #1's professional competency.

58. However, Defendants repeatedly disregarded the known and obvious risks to Plaintiff's health and safety. As documented herein, Defendants did nothing as the state of Plaintiff's injuries declined. This indifference is evidenced by the Defendant's failure to provide further medical treatment to Plaintiff, despite the clear evidence that Plaintiff suffered a serious head injury as a result of the assault, of which would require Plaintiff to be examined at a hospital with the necessary diagnostic equipment and personnel.

59. As a direct and proximate result of Defendants' conduct, Plaintiff experienced physical pain, severe emotional distress, mental anguish, loss of his health, and the damages alleged herein.

60. As a direct and proximate result of Defendants' conduct Plaintiff has suffered damages and is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the Defendant's deprivation of Plaintiff's rights secured by the Fourth, Sixth, and Eighth Amendments through Fourteenth Amendment of the U.S. Constitution.

III.    **SUPERVISOR LIABILITY/OFFICIAL CAPACITY LIABILITY**

**(As to Sheriff Glanz)**
**(42 U.S.C. § 1983)**

61. Paragraphs 1-58 are incorporated herein by reference.

62. There is an affirmative link between the aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Plaintiff's serious medical needs, health and safety and policies, practices and/or customs which Defendant Sherriff Stanley Glanz promulgated, created, implemented and/or possessed responsibility for (*See* ¶¶ 27-44, *supra*)

63. Defendant Glanz knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Plaintiff.

64. Defendant Glanz disregarded the known and/or obvious risks to the health and safety of inmates like Plaintiff.

65. Defendant Glanz, through his continued encouragement, ratification, and approval of the aforementioned policies, practices, and/or customs, in spite of their known and/or obvious inadequacies and dangers, was deliberately indifferent to inmates', including Plaintiff's, serious medical needs.

66. There is an affirmative link between the unconstitutional acts of their subordinates and Defendant Glanz's adoption and/or maintenance of the aforementioned policies, practices and/or customs.

67. As a direct and proximate result of the aforementioned policies, practices and/or customs, Plaintiff suffered injuries and damages as alleged herein.

**IV. MUNICIPAL LIABILITY**

**(as to ARMOR)**
**(42 U.S.C. § 1983)**

68. Paragraphs 1-65 are incorporated herein by reference.

69. ARMOR is a "person" for purposes of 42 U.S.C. § 1983.

70. At all times pertinent hereto, ARMOR was acting under color of state law.

71. ARMOR has been endowed by Tulsa County with powers or functions governmental in nature, such that ARMOR became an instrumentality of the State and subject to its constitutional limitations.

72. ARMOR is charged with implementing and assisting in developing the policies of Sheriff Glanz/TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and have shared responsibility to adequately train and supervise its employees.

73. There is an affirmative causal link between the aforementioned acts and/or omissions in being deliberately indifferent to Plaintiff's serious medical needs, health, and safety, and violating Plaintiff's civil rights and above-described customs, policies, and/or practices carried out by ARMOR.

74. ARMOR knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Plaintiff. Nevertheless, ARMOR failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Plaintiff's, serious medical needs.

75. ARMOR tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

17

76. There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein.

## PUNITIVE DAMAGES

77. Plaintiff re-alleges and incorporates by reference paragraphs 1-74, as though fully set forth herein.

78. Plaintiff is entitled to punitive damages on his claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts and omissions alleged herein constitute reckless or callous indifference to Plaintiff's federally protected rights.

79. Plaintiff is entitled to punitive damages on his negligence claims as Defendants' conduct, acts and omissions alleged herein constitute reckless disregard for Plaintiff's rights.

WHERFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

SMOLEN, SMOLEN & ROYTMAN, PLLC

/s/Donald E. Smolen, II
Donald E. Smolen, II, OBA #19944
Robert M. Blakemore, OBA #18656
Laura Lauth, OBA #22619
701 S. Cincinnati Avenue

18

Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
*Attorneys for Plaintiff*