IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SCOTT BIRDWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 15-CV-304-TCK-FHM |
| | ) |
| STANLEY GLANZ, in his personal capacity; | ) |
| VIC REGALADO, SHERIFF OF TULSA | ) |
| COUNTY, in his official capacity; BOARD | ) |
| OF COUNTY COMMISSIONERS OF | ) |
| TULSA COUNTY; ARMOR | ) |
| CORRECTIONAL HEALTH SERVICES, | ) |
| INC.; NURSE CUNNINGHAM; and JOHN | ) |
| ABRAHAM, M.D., | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court are Defendants Stanley Glanz's and Vic Regalado's Motion for Summary Judgment (Doc. 118), Defendant Armor Correctional Health Services, Inc.'s Motion for Summary Judgment (Doc. 120), Defendant John Abraham's Motion for Summary Judgment (Doc. 121) and Defendant Nurse Cunningham's Motion for Summary Judgment (Doc. 122).[1] For reasons discussed below, these Motions for Summary Judgment are **GRANTED**.

I.  Statement of Undisputed Material Facts

This case concerns the adequacy of the medical care that Plaintiff received in the Tulsa County Jail ("Jail") during three weeks in June of 2014. During this time, medical services and medication in the Jail were provided in part by Defendant Armor Correctional Health Services, Inc. ("Armor"). Defendants John Abraham ("Dr. Abraham") and Nurse Cunningham were

---

[1] Defendant Board of County Commissioners of Tulsa County ("BOCC") also filed a Motion for Summary Judgment. (Doc. 115.) After BOCC filed its Motion for Summary Judgment, Plaintiff withdrew his claims against BOCC. (Doc. 149.)

1

employees of Armor. (Doc. 74, ¶ 5-7.) On June 7, 2014, while Plaintiff Scott Birdwell ("Plaintiff") was incarcerated in the Jail, he was assaulted by another inmate with an unknown object and sustained a serious laceration above his left eye. (Doc. 118, pg. 2; Doc. 118-3, pg. 11; Doc. 143-1 pg. 2). Upon his entry into the infirmary, Plaintiff asked to be sent to the hospital. (Doc. 143-2, pg. 7.) John Abraham ("Dr. Abraham"), the medical director of the Jail, told Plaintiff that he didn't think Plaintiff needed to go to the emergency room. (Doc. 143-2, pg. 8; Doc. 143-4, pg. 2-7.) Plaintiff disagreed with this assessment. (Doc. 143-2, pg. 11.)

Dr. Abraham immediately administered local anesthetic and sutured up the laceration in the Jail infirmary. He did not have Plaintiff sign a written informed consent form, and Plaintiff felt as if he did not have a choice. (Doc. 143-2, pg. 10.) Dr. Abraham took 90 minutes to put in 23 stitches (also called "sutures"). (Doc. 143-2, pg. 5.) Due to the length of the procedure, Dr. Abraham had to pause to administer additional anesthesia.[2] (Doc. 118-3, pg. 12-13.) According to Dr. Abraham's note describing the suturing, he used lidocaine with epinephrine to anesthetize the area he was suturing. Epinephrine was not the appropriate anesthetic to use, as it presents the risk of tissue death. (Doc. 120-6, pg. 131-132; Doc. 145-3, pg. 83.) After suturing up Plaintiff's wound, Dr. Abraham prescribed Plaintiff acetaminophen with codeine, as well as naproxen. (Doc. 143-3, pg. 83; Doc. 120, ¶ 48, 49; Doc. 145, ¶ 48, 49.) However, Dr. Abraham's notes on the procedure do not indicate that he tested Plaintiff's visual acuity. (Doc. 145-3, pg. 83.)

---

[2] In his briefing, Plaintiff contends that Dr. Abraham's suturing caused him pain. *See, e.g.*, Doc. 146, pg. 8-9. However, this fact is contradicted by Plaintiff's own testimony, in which he testified that when the initial dose of local anesthetic started to wear off, Dr. Abraham paused the suturing procedure to readminister anesthetic. (Doc. 146-2, pg. 4-5.) Where a factual contention is contradicted by Plaintiff's own testimony, it is "blatantly contradicted by the record," and the Court will not adopt it. *See George v. Newman*, 726 F. App'x 699, 704 (10th Cir. 2018) (unpublished) citing *Scott*, 550 U.S. at 380. *See infra* n. 4.

2

The parties agree that the eyebrow is a very difficult area to suture over and suturing is a painful procedure. (Doc. 120, ¶ 30; Doc. 145, ¶ 30.) Plaintiff, however, testified he believed that Dr. Abraham was not experienced enough to perform the suturing. (Doc. 143-2, pg. 10.) Plaintiff has also testified that Nurse Gail Osburn told him that Dr. Abraham told her that he should have sent Plaintiff to the hospital. (Doc. 147-2, pg. 11-12.)[3]

After the suturing procedure, Plaintiff told Dr. Abraham that he "had a funny feeling" and that he thought there was a more serious underlying condition. Dr. Abraham, however, responded to Plaintiff that these symptoms are to be expected, that the symptoms were directly related to the laceration, and that he believed that Plaintiff's symptoms would go away in a couple of days. (Doc. 120, ¶ 40, 41; Doc. 145, ¶ 40, 41.) Additionally, after the suturing procedure, Dr. Abraham said, in the presence of both Plaintiff and Nurse Latrice Cunningham ("Nurse Cunningham"), that Plaintiff should have his sutures removed "after five days." (Doc. 120-5, pg. 22; Doc. 145-4, pg. 34-35.) Though it is not clear from the record on whom the responsibility to initiate Plaintiff's appointment to have the sutures removed was imposed, for the purposes of these motions for summary judgment, the Court will assume that it was the Jail medical staff's responsibility to arrange the appointment for removing the stitches. However, the parties agree that Plaintiff did not report any ear drainage to Dr. Abraham during the June 7, 2014 encounter. Additionally, Plaintiff's Medical Administration Record indicates, and Plaintiff does not appear to contest, that except for rare occasions when Plaintiff was not present, he was given near-daily pain medication

---

[3] This statement is hearsay and would not be admissible at trial. However, Plaintiff could produce Nurse Gail Osburn as a witness at trial to testify not to the accuracy of Dr. Abraham's statement but to the fact that he said it to her. Dr. Abraham's statement, regardless of its accuracy may demonstrate that Plaintiff has satisfied the subjective component as to Dr. Abraham. Accordingly, Plaintiff's inadmissible hearsay testimony is admissible on summary judgment to the existence of Dr. Abraham's statement only, not its accuracy. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1996).

3

from at least the time of his assault to the time of his June 26, 2014 release to Creek County Jail. (Doc. 120-2; Doc. 145-3, pg. 59-61.)

Plaintiff made a kiosk call on June 10, 2014, three days after he was assaulted. In it, he said that his "EYE [W]AS HURTING VERY BAD AND [HIS VISION WAS] VERY BLURRY. JUST GOT 23 STITCHES BUT THEY DIDN'T EVEN LOOK AT MY EYE BALL." (Doc. 120-3, pg. 5.) The next day, June 11, 2014, Michael Eubank, LPN, ("Nurse Eubank") the sick call nurse, assessed Plaintiff's eye. Nurse Eubank noted eye redness and drainage that began "4 days ago." Plaintiff described his pain level as "moderate" and attributed the pain to the assault he suffered on June 7, 2014. Nurse Eubank also noted that Plaintiff had "blood in the eye from altercation." During that visit, Nurse Eubank also gave Plaintiff some Ibuprofen for a toothache, and instructed Plaintiff to return to sick call if his symptoms worsen or persist more than seven days. (Doc. 120-2, pg. 36-38.)[4] There is no evidence in the records of Nurse Eubank testing Plaintiff's visual acuity. (Doc. 145-3, pg. 36.)

After his examination by Nurse Eubank, Plaintiff made daily requests to have his sutures removed. He made his first request on June 12, 2014, five days after the sutures were placed. He placed these daily requests until his sutures were removed on June 17, 2014. (Doc. 143-4, pg. 36; Doc. 145, pg. 15.) The parties agree that while Plaintiff was making these requests, on June 14, 2014, John Laymon, APRN, placed a phone order indicating that Plaintiff's stitches needed to be

---

[4] Though Plaintiff does not recall this examination by Nurse Eubank, he does not appear to contest that it actually occurred. (Doc. 143, pg. 8; Doc. 143-2, pg. 73-74.) To the extent that he does contest that it actually occurred, "[w]here opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott v. Harris*, 550 U.S. 372, 378 (2007). In this case, Plaintiff's "Full Patient History" presents a detailed account of Nurse Eubank's examination, which Plaintiff simply states that he does not recall. (Doc. 120-2, pg. 36-38; Doc. 143-2, pg. 73-74.) However, it does not appear that Plaintiff alleges any fraud or alteration in these records. Absent any allegation or indication that the records are unreliable, the Court will accept the records as accurate on this point.

4

removed. However, there is no evidence either that Plaintiff's stitches were actually removed on that date, or that Plaintiff failed to attend an appointment on that date. Plaintiff's expert, Dr. Wilson, has testified that Plaintiff experienced increased pain due to this delay in removing his sutures. (Doc. 145-5, pg. 3; 145-6, pg. 2.)

There is considerable ambiguity in the record regarding the timing of the removal of Plaintiff's sutures. Though Plaintiff's position throughout his briefing is not entirely uniform, Plaintiff testified that his sutures were removed on June 17, 2014, by Nurse Cunningham. (Doc. 122-5, pg. 70). Plaintiff further testified that by the time his sutures were removed, skin had grown over the sutures. (Doc. 147-2, pg. 20.) He also testified that Nurse Cunningham said that she had never removed sutures before, and that when she removed his stitches, she did not use anesthetic, and removed them not by cutting, but by pulling and tugging. (Doc. 147-2, pg. 19-21.) Plaintiff testified that the removal was more painful than the initial assault, and caused the wound to reopen, though Nurse Cunningham resealed it with a butterfly Band-Aid. (Doc. 147-2, pg. 20-21.)[5] Plaintiff also testified that Nurse Cunningham's inept removal of his sutures made the aftermath of the removal more painful. (Doc. 147-2, pg. 21.) Plaintiff's expert also contends that it caused increased scarring. (Doc. 145-5, pg. 4-5.) Though Defendants have presented considerable evidence that contradicts Plaintiff's testimony, due to the ambiguity in the record, and for the purposes of the motions for summary judgment, the Court will adopt Plaintiff's version of events.

---

[5] Plaintiff testified in his deposition on February 9, 2017 that he "still [has] stitches underneath [his] skin." (Doc. 120-5, pg. 25.) However, this testimony is belied by the medical records in this case. On October 22, 2015, Plaintiff had a CT scan, the findings of which make no mention of sutures remaining in his head. (Doc. 120-12, pg. 1; Doc. 120-8, pg. 37.) As with Nurse Eubank's examination of Plaintiff on June 11, 2014, Plaintiff does not allege fraud in this CT scan. Accordingly, the Court will accept the medical records as accurate on this point. *See* supra n.2. Moreover, even if there is a genuine dispute of fact as to whether Plaintiff still has stitches in his face, the dispute is not material, as even with this fact, Plaintiff will not have shown more than negligence. *See infra* III.B.4.

However, as Plaintiff notes, one of the records inconsistent with Plaintiff's recollection contains a note of "CONTINUED EYE PAIN AFTER ALTERCATION" dated June 20, 2014. (Doc. 145-3, pg. 63.)

On June 23, 2014, Plaintiff placed a kiosk call complaining of "BLURRED VISION, MIGRAINS, SHOOTING PAINS AND DRAINAGE IN MY EAR FROM GETTING HIT IN TH[E] HEAD T[W]O WEEK[S] AGO SATURDAY." He also reported that the stitches were "grown in" at the time they were removed, and that removing the stitches reopened his wound. (Doc. 120-3, pg. 6.) The next day, on June 24, 2014, Dr. Abraham saw Plaintiff in the infirmary. In his note, Dr. Abraham noted that he had seen Plaintiff both the previous week and on that day. Plaintiff had complained of persistent eye pain in his left eye, and no improvement with naproxen, as well as paresthesia (numbness of his face), and migraine-type symptoms, including blurred vision and a new complaint of light sensitivity. Dr. Abraham noted that Plaintiff appeared uncomfortable, but that the suture site was healing well, though it was tender to palpitation. (Doc. 143-3, pg. 83.)

At the end of Plaintiff's appointment, Dr. Abraham ordered an x-ray, a referral to optometry for visual changes, and medication to treat both pain and Plaintiff's potential conditions. He also noted that he would consider an ophthalmology or ENT referral based on optometry and x-ray evaluations. (Doc. 120-2, pg. 83.) Plaintiff's "facial/head xrays special attention to left orbit to r/o facial and orbital fractures" was completed on June 25, 2014. (Doc. 120-2, pg. 64.) The parties agree that Plaintiff's x-ray was normal and he sustained no fractures as a result of the assault. (Doc. 120, ¶ 105.) However, Plaintiff was transferred out of the Tulsa County Jail on June 26, 2014, the day after his x-ray, and so was unable to attend his optometry appointment. (Doc. 120, ¶ 110.)

## II. Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). In its summary judgment analysis, the Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A movant that "will not bear the burden of persuasion at trial need not negate the nonmovant's claim," but may "simply . . . point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal citations omitted). If the movant makes this prima facie showing, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing FED. R. CIV. P. 56(e)). To meet this burden, the nonmovant must set forth facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)). "In response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (internal citations omitted).

**III. Section 1983 Claim for Cruel and Unusual Punishment**

**A. Eighth Amendment Standard**

The government is obligated to provide medical care to prisoners and pretrial detainees, and failure to do so may violate the Eighth Amendment. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002); *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976.) On an Eighth Amendment claim, a Plaintiff must show deliberate indifference to a substantial risk of serious harm. *See Tennant v. Miller*, 589 F. App'x 884, 885 (10th Cir. 2014) (unpublished) citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The claim contains both objective and subjective elements. To satisfy the objective component, Plaintiff must first produce objective evidence that the deprivation at issue was in fact "sufficiently serious." *See Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). A medical need is sufficiently serious if "it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The purpose of the objective component analysis is to "limit claims to significant, as opposed to trivial, suffering." *See Mata*, 427 F.3d at 753. The Court looks to whether the "alleged harm" is sufficiently serious, rather than whether the symptoms displayed are sufficiently serious. *See id.*

However, while prisoners are entitled to medical care throughout their incarceration, they are not entitled to insist on a particular course of treatment. *See Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006); *Green v. Branson*, 108 F.3d 1296, 1304 (10th Cir. 1997). Moreover, undisputed facts that establish only that a medical professional has been negligent in diagnosing or treating a medical condition will not survive summary judgment under the Eighth Amendment. Neither medical malpractice nor a disagreement about medical judgment constitutes deliberate indifference. *See Green*, 108 F.3d at 1303. Accordingly, where medical records indicate that the

Plaintiff has received a consistent course of treatment for the medical ailments complained of, these facts will not demonstrate deliberate indifference. *See Debrow v. Kaiser*, 42 F. App'x 269 (10th Cir. 2002) citing *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976). However, a delay in providing treatment may violate the Eighth Amendment. *See Mata*, 427 F.3d at 751.

To satisfy the subjective component of the deliberate indifference test, Plaintiff must present evidence of the prison official's culpable state of mind. *See Mata*, 427 F.3d at 751. The state of mind required for deliberate indifference is akin to that of criminal recklessness—conscious disregard for a substantial risk of serious harm. *See Farmer*, 511 U.S. at 836. In a prison context, this means that the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference. *See Farmer*, 511 U.S. at 837. However, a prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role."

### B. Objective Component Analysis

Because analysis of the objective component will be the same for all Defendants against whom an Eighth Amendment claim is made, the Court considers it without reference to any specific Defendant. Plaintiff appears to argue that the following deprivations were sufficiently serious to satisfy the objective component:

(1.) That he was not sent to the emergency room to be sutured after the initial assault

(2.) That Dr. Abraham failed to have Plaintiff sign a consent form

(3.) That Dr. Abraham sutured Plaintiff's wounds poorly, both by taking too long to suture Plaintiff's wound and by using an inappropriate anesthetic

(4.) That Plaintiff's sutures were not removed in an appropriate timeframe

9

(5.) That Nurse Cunningham had never removed sutures before, and her removal of the sutures caused him pain, and caused the wound to reopen

(6.) That the prison medical staff failed to provide testing for ongoing symptoms

First, the two cases that Plaintiff cites in support of his claim that these undisputed facts satisfy the objective component are inapposite, as both cases concern lacerations sustained in failure to protect claims. *See, e.g.*, *Spencer v. Hussan*, No. 10-CV-822A, 2013 WL 5223816, at *4 (W.D.N.Y. Sept. 13, 2013) (laceration requiring five sutures was sufficiently serious to satisfy the objective prong of an Eighth Amendment claim in a failure to protect claim); *Green v. Leubner*, No. 07–CV–1035, 2009 WL 3064749, at *6 (N.D.N.Y. Sept. 22, 2009) (laceration requiring 18 steri-strips was sufficiently serious to satisfy the objective prong of an Eighth Amendment claim in a failure to protect claim). By contrast, in this case, Plaintiff has explicitly agreed that neither Armor nor the prison medical staff are responsible for his initial assault on June 7, 2014. (Doc. 120, ¶ 9; Doc. 145, ¶ 13). Accordingly, the simple fact of his injury cannot by itself satisfy the objective component. Rather, the alleged deprivations themselves must be sufficiently serious to satisfy the objective component.

### 1. Dr. Abraham suturing Plaintiff's wounds poorly in the Jail infirmary. rather than sending him to the emergency room

Neither Dr. Abraham's failure to send Plaintiff to the emergency room, nor his alleged inadequate suturing of Plaintiff's wound satisfy the objective component. The Parties agree that Dr. Abraham provided Plaintiff with medical care by suturing his wound in the Jail infirmary. Instead, Plaintiff criticizes Dr. Abraham's failure to send him to the emergency room, for taking too long to suture the wound, and for using the wrong anesthetic. As Plaintiff himself concedes, he just disagrees with the type of treatment that Dr. Abraham provided. Plaintiff has submitted evidence that Dr. Abraham did not send Plaintiff to the emergency room, that he took 90 minutes

to suture Plaintiff's wound, and that he used the incorrect anesthetic. This evidence supports, at most, a conclusion that Dr. Abraham was negligent in diagnosing or treating a medical condition. Mere negligence does not become a constitutional claim merely because the victim is a prisoner. *See Spencer v. Abbott*, 731 F. App'x 731, 744 (10th Cir. 2017) citing *Estelle v. Gambel*, 429 U.S. 97, 106 (1976) (undisputed facts that establish that a physician has been negligent in diagnosing or treating a medical condition do not establish medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.); *Mata*, 427 F.3d at 751. Accordingly, neither the fact that Dr. Abraham did not sent Plaintiff to the emergency room nor the type of treatment he provided in the Jail infirmary is sufficiently serious to satisfy the objective component of deliberate indifference.

### 2. Lack of Consent Form

It is not clear whether Plaintiff's testimony that Dr. Abraham did not have him sign a consent form at the beginning of the procedure is an independent allegation of harm, or merely a component of Plaintiff's contention that he should have been sent to the emergency room to be sutured. Nonetheless, failure to have Plaintiff sign a consent form does not rise to the level of a constitutional violation. The deprivation is not so serious that it denied "the minimal civilized measure of life's necessities" or "pos[ed] a substantial risk of serious harm." *See Farmer*, 511 U.S. at 832.

### 3. Plaintiff's stiches were not removed in an appropriate timeframe

The delay in removing Plaintiff's stitches also fails to satisfy the objective component. While a delay in providing medical treatment may violate the Eighth Amendment, these delays "only constitute an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *See Mata*, 427 F.3d at 751. The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (internal citations

11

omitted.) However, delays that have been found to violate the Eighth Amendment have frequently involved life-threatening situations and instances where it is apparent that delay would exacerbate the prisoner's medical problems. *See Rashad v. Doughty*, 4 F. App'x 558, 561 (10th Cir. 2001) citing *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

In this case, it is undisputed that Plaintiff's sutures should have been removed five days after they were put in, but that they were not removed until ten days after they were put in. (Doc. 122-5, pg. 70; Doc. 147-4, pg. 41.) It is also undisputed that on June 14, 2014, a member of the Jail medical staff placed an order for Plaintiff's sutures to be removed, and that order was not followed. Finally, it is undisputed that because of this delay, skin had grown over the sutures, and the process of removing them was more painful than the initial assault, and caused the wound to reopen and be resealed with a butterfly Band Aid. Plaintiff argues that this level of pain satisfies the "considerable pain" element of substantial harm, thus satisfying the objective component.

However, while Plaintiff's pain was no doubt serious, it does not rise to the level of other situations which have satisfied the "considerable pain" element of substantial harm. For example, in *Sealock v. Colorado*, evidence of a several hour delay in treatment where a plaintiff presented with severe chest pain which he reasonably believed was caused by a heart attack, was sufficiently serious to satisfy the objective component. *See* 218 F.3d 1205, 1210 (10th Cir. 2000). Similarly, in *Al-Turki v. Robinson*, a prisoner satisfied the objective component where the record proved he endured pain from kidney stones so severe that he collapsed, vomited, and believed he was dying, and received neither medical treatment to reduce his pain, or a diagnosis that could have alleviated his fear of death. 762 F.3d 1188, 1193 (10th Cir. 2014). In *Oxendine v. Kaplan*, the Court held that a prisoner satisfied the objective component where, among other harms, a prisoner experienced considerable pain for at least fifteen days as her finger rotted. 241 F.3d 1272, 1278 (10th Cir. 2001).

12

In this case, Dr. Wilson testified that sutures that are not timely removed can cause pain, and noted in his expert report that Plaintiff in fact experienced increased pain from the delay. (Doc. 145-5, pg. 3; Doc. 145-6, pg. 2.) While Dr. Wilson did not specify the level of pain that Plaintiff experienced, because Plaintiff testified that his sutures were removed five days late, Plaintiff can only have endured this pain for five days. Moreover, the Court has before it no allegations or evidence indicating that Plaintiff's pain was severe or life-threatening. Medical records indicate that Plaintiff received near-daily pain-medication during this five-day delay, unlike the Plaintiffs in *Oxendine*, *Sealock*, and *Al-Turki*. (Doc. 120-2; Doc. 145-3, pg. 59-61.) The lack of any evidence, testimony, or even allegation that Plaintiff's pain from the delay of his sutures was severe or life-threatening, coupled with his regular access to pain medication, indicates that this pain does not rise to the level of "considerable pain" as described in cases where the Tenth Circuit has found considerable pain.

Similarly, Plaintiff has testified that the extended wait made the removal more painful, and that the pain of the eventual removal was more painful than the initial assault. Plaintiff testified that the delay in removal made the aftermath of the removal more painful. However, while Plaintiff does not state exactly how long the increased pain due to removal of stitches lasted, he does not appear to testify that the pain lasted anywhere near as long as it did in cases where the Tenth Circuit has found "considerable pain." Moreover, unlike the plaintiffs in *Oxendine*, *Mata*, and *Al-Turki*, Plaintiff received immediate and ongoing treatment for his pain after Nurse Cunningham removed the sutures. (Doc. 120-2; Doc. 145-3, pg. 59-61.) Accordingly, the delay in removing Plaintiff's sutures is not sufficiently serious to satisfy the objective component.

4. **Poor removal of sutures**

Similarly, Nurse Cunningham's inept removal of Plaintiff's stitches also does not satisfy the objective component. Plaintiff testified that Nurse Cunningham had no experience in removing

13

sutures, that she removed them improperly, and that removal caused pain worse than the initial assault, and reopened the wound, which then had to be resealed with a butterfly Band Aid. Dr. Wilson also contends that it caused increased scarring. (Doc. 145-5, pg. 4-5.) Like Plaintiff's testimony that Dr. Abraham did a poor job of suturing Plaintiff's wound, this evidence supports, at most, a conclusion that Nurse Cunningham was negligent in diagnosing or treating a medical condition. However, negligence does not become a constitutional claim merely because the victim is a prisoner. *See Spencer*, 731 F. App'x at 744 (undisputed facts that establish that a physician has been negligent in diagnosing or treating a medical condition do not establish medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.); *Mata*, 427 F.3d at 751.

Plaintiff testified that his sutures were removed improperly, causing pain and reopening his wound, and Dr. Wilson contends that it caused increased scarring. This level of harm falls short of the level of harm found sufficiently serious in other cases. For example, in *Mata v. Saiz*, the Court held that a prisoner satisfied the objective component where a prisoner reported severe chest pain to the infirmary three times in the course of about 36 hours before being sent to the hospital, suffered permanent and irreversible damage to her heart and sustained a permanent disability. *See* 427 F.3d at 751. Similarly, in *Lopez v. Lemaster*, evidence of severe contusions and strains to multiple body parts was enough to satisfy the objective component. *See* 172 F.3d 756, 763 (10th Cir. 1999). In *Kikimura v. Osagie*, a plaintiff's allegations of severe, "torturous" pain and cramps, psychological anguish and horror of death as a result of undiagnosed hyponatremic encephalopathy were enough to survive a motion to dismiss. *See* 461 F.3d 1269, 1292 (10th Cir. 2006). In contrast, the facts presented by Plaintiff demonstrate no more than negligence on the part of Nurse Cunningham, and cannot satisfy the objective component.

14

### 5. The prison medical staff failed to provide testing for ongoing symptoms

Finally, Dr. Wilson's contention in his report that the prison medical staff failed to provide testing and diagnostics for Plaintiff's ongoing symptoms fails to satisfy the objective component, because the uncontested factual record belies this opinion. (Doc. 145-5, pg. 6.) Plaintiff made two kiosk calls regarding the aftermath of his assault, one on June 10, 2014, and one on June 23, 2014. In both cases, he was seen by a health care professional the next day. The health care professional provided Plaintiff with medicine to treat his symptoms, and also with instructions for how to proceed going forward. On June 24, 2014, Dr. Abraham also ordered an x-ray and that Plaintiff be referred to optometry for visual changes. The x-ray took place the following day, on June 25, 2014. However, Plaintiff was transferred out of the Tulsa County Jail and booked into Creek County Jail on June 26, 2014, and was not able to attend his optometry appointment. Any deficiencies in this ongoing treatment, which Plaintiff does not specifically identify, are not sufficiently serious to support a conclusion that Plaintiff was denied "the minimal civilized measure of life's necessities" or that the deficiencies "pos[e] a substantial risk of serious harm." *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

To the extent that Plaintiff specifically challenges the Jail medical staff failure to test his visual acuity either after his initial assault on June 7, 2014, or during the June 11, 2014 evaluation by Nurse Eubank (Doc. 122-6, pg. 148-151), this evidence at most supports a conclusion that Dr. Abraham or Nurse Eubank were negligent in diagnosing or treating a medical condition. However, where a Plaintiff receives a consistent course of treatment for medical ailments—even where evidence demonstrates negligence in that care—the facts will not demonstrate deliberate indifference. *See Debrow v. Kaiser*, 42 F. App'x 269 (10th Cir. 2002). In this case, Plaintiff agrees that he received medical care immediately after his assault on June 7, 2014, and does not contest that he was evaluated by Nurse Eubank on June 11, 2014. These facts demonstrate a consistent

course of treatment for his medical ailments. Though Plaintiff has presented evidence that Jail medical staff did not test his visual acuity at two different points during this course of treatment, because he received a consistent course of treatment, Plaintiff has presented, at most, evidence of negligence. As noted *supra*, however, negligence does not become a constitutional claim merely because the victim is a prisoner. *See Spencer*, 731 F. App'x at 744; *Mata*, 427 F.3d at 751. Accordingly, the fact that Jail medical staff did not test Plaintiff's visual acuity does not satisfy the objective component.

The Court finds that Plaintiff has failed to satisfy the objective component of his claim, and Defendants Glanz's and Regalado's Motion for Summary Judgment (Doc. 117), Defendant Armor Correctional Health Service's Motion for Summary Judgment (Doc. 120), Defendant John Abraham's Motion for Summary Judgment (Doc. 121) and Defendant Nurse Cunningham's Motion for Summary Judgment (Doc. 122) are all **GRANTED** as to the Eighth Amendment Claims.

## IV. Supervisory Liability

Plaintiff cannot sustain a supervisory liability claim without an underlying constitutional violation. *See Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009) (sheriff could not be held liable under a theory of supervisory liability when there was no underlying constitutional violation.) Because Plaintiff has not proven a constitutional violation, Defendants Glanz's and Regalado's Motion for Summary Judgment is **GRANTED** as to Plaintiff's supervisory liability claim.

## V. Municipal Liability

Likewise, Plaintiff cannot sustain a municipal liability claim without an underlying constitutional violation. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 ("We will not hold a municipality liable for constitutional violations when there was no underlying constitutional

violation by any of its officers.") (internal citations omitted). Accordingly, Defendant Armor's Motion for Summary Judgment is **GRANTED** as to Plaintiff's municipal liability claim.

VI.     **Negligence**

Plaintiff also brings a claim for common law negligence against Defendants Armor, John Abraham, and Nurse Cunningham.[6] Defendants Armor, John Abraham, and Nurse Cunningham argue that they are immune from tort liability under the Oklahoma Government Tort Claims Act ("GTCA"). Defendants are correct that the GTCA specifically prohibits tort suits, including common law torts, arising out of the "operation or maintenance of any prison, jail, or correctional facility." *See* OKLA. STAT. tit. 51 §§ 152(14); 155(25). The question remains, however, whether that immunity extends to private corporations, such as Armor, that contract with the state to provide healthcare services, and their employees.

When a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit, the Court must follow the same rule as a federal court sitting in diversity, and apply the substantive law of the forum state. *See Bancoklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999). If the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issues. *See Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988).

In *Barrios v. Haskell*, a 2018 case in which the Oklahoma Supreme Court held that "constitutional" torts under the Oklahoma Constitution were governed by the GTCA, the Oklahoma Supreme Court assumed for the purposes of answering a certified question that Turn Key Health, LLC, another corporation that has contracted with Tulsa County to deliver medical care to arrestees at the Tulsa County Jail, and its employees were "employees" under OKLA. STAT.

---

[6] Plaintiff also brought a common law negligence claim against BOCC, but has since withdrawn all claims against BOCC. (Doc. 149.)

17

tit. 51, § 152(7)(b) and therefore included in the GTCA's grant of immunity. In doing so, the Oklahoma Supreme Court noted that "[g]enerally speaking, the staff of a healthcare contractor at a jail are "employees" who are entitled to tort immunity under the GTCA by virtue of [OKLA. STAT. tit. 51] sections 152(7)(b), 153(A), and 155(25)." *See Barrios v. Haskell County Public Facilities Auth. et. al.*, 2018 OK 90, 432 P.3d 233, 236 and 238-239 (Okla. Dec. 4, 2018).

Though this District has held to the contrary in the past, *see Freeman v. Glanz*, No. 16-cv-534-JHP-PJC, 2017 U.S. Dist. LEXIS 90540, *18-21 (N.D. Okla. June 13, 2017), the *Barrios* holding provides a strong indication that the Oklahoma Supreme Court would find both Armor and its employees, John Abraham and Nurse Cunningham, to be "employees" under the GTCA who are entitled to immunity from tort liability. Moreover, the only case in this District to interpret *Barrios* is in accord with this analysis. *See Prince v. Turn Key Health Clinics, LLC*, 18-cv-0282-CVE-JFJ, 2019 U.S. Dist. LEXIS 7716, *26 (N.D. Okla. Jan. 16, 2019) ("Although the Oklahoma Supreme Court did not definitively hold that Turn Key is an 'employee' under the OGTCA, the Court finds persuasive the court's reasoning for assuming that Turn Key is an 'employee.' The Court finds that Turn Key is an 'employee' under the OGTCA and, therefore, is immune from tort liability.").

Accordingly, the Court holds that Defendants Armor, John Abraham, and Nurse Cunningham are employees under the GTCA, and are entitled to immunity from tort suits arising out of the "operation or maintenance of any prison, jail, or correctional facility," such as this one. *See* OKLA. STAT. tit. 51 §§ 152(14); 155(25). Defendants Armor's, John Abraham's, and Nurse Cunningham's Motions for Summary Judgment are **GRANTED** as to Plaintiff's negligence claims.

## VII. Conclusion

For the reasons set forth above, the Court finds that Plaintiff has failed to establish a genuine dispute of material facts as to either his Eighth Amendment claims, his Supervisory Liability claims, his Municipal Liability claim, or his negligence claims.

Defendant Board of County Commissioners of Tulsa County's Motion for Summary Judgment (Doc. 115) is **DENIED AS MOOT.** Defendant Board of County Commissioners of Tulsa County is **DISMISSED** from this litigation.

Defendants Stanley Glanz's and Vic Regalado's Motion in Limine (Doc. 117) is **DENIED AS MOOT.**

Defendants Stanley Glanz's and Vic Regalado's Motion for Summary Judgment (Doc. 118) is **GRANTED.**

Defendants John Abraham's, Armor Correctional Health Services, Inc.'s, and Nurse Cunningham's Joint Motion in Limine (Doc. 119) is **DENIED AS MOOT.**

Defendant's Armor Correctional Health Services, Inc.'s Motion for Summary Judgment (Doc. 120) is **GRANTED.**

Defendant John Abraham's Motion for Summary Judgment (Doc. 121) is **GRANTED.**

Defendant Nurse Cunningham's Motion for Summary Judgment (Doc. 122) is **GRANTED.**

An order of judgment will be entered separately.

**SO ORDERED.**

**DATED THIS 12th day of March, 2019.**

*[signature]*
**TERENCE C. KERN**
**United States District Judge**